BREMNER v. HENDRICKSON et al.

Circuit Court of Appeals, Eighth Circuit.
March 19, 1929.

No. 8283.

C. W. Wright, of Minneapolis, Minn. (M. M. Joyce, of Minneapolis, Minn., on the brief), for appellant.

J. H. Mulally, of St. Paul, Minn. (A. L. Janes, of St. Paul, Minn., and Tracy Peycke,

of Minneapolis, Minn., on the brief), for appellee Great Northern Ry. Co.

Daggett & Redlund, of St. Paul, Minn., for appellee Hendrickson.

Before STONE, LEWIS, and COTTERAL, Circuit Judges.

STONE, Circuit Judge. This is an action for personal injuries for the death of Hans Hendrickson, caused by falling over a retaining wall on High street, between Marquette avenue and Second avenue, in the city of Minneapolis. The suit was filed against the receiver of the Minneapolis & St. Louis Railroad Company and against the Great Northern Railway. During the course of the trial, the court sustained a motion by the Great Northern to dismiss as to it. Thereafter the case proceeded to a verdict and judgment in favor of the plaintiff against the receiver. There was no appeal by the plaintiff from the order dismissing as to the Great Northern. The only appeal is that of the receiver from the judgment and from the order dismissing as to the Great Northern. It is difficult to conceive of any grounds whereon the receiver can object to the dismissal as to the Great Northern. There are no contractual relations between the receiver and the Great Northern or any other legal connection shown in this record which would constitute any legal liability between those two parties arising out of this accident. The only party having a right to complain of this dismissal is the plaintiff and he has not seen fit to bring an appeal therefrom so that part of appellant's complaint here is unfounded.

Appellant urges several matters, each of which it claims entitled it to the directed verdict sought in the trial court. We are so clearly convinced that one of these is correct that we deem it unnecessary to discuss the others.

Apparently, the petition of plaintiff is based upon a violation of the state statutory duty to properly fence the right of way of the Minneapolis & St. Louis Railroad Company. However, whether the suit is based upon that theory alone, or also upon the common-law duty to protect a dangerous condition, is immaterial as the facts which excuse this appellant in one instance would have the same effect in the other.

The facts of this case are very unique and require some fullness of statement. Both of the appellees expressly say that the statement of the facts by the appellant is accurate. A summary of the material parts of that statement is as follows:

"High street between Marquette and Second Avenue South in the city of Minneapolis runs approximately east and west and is upon a level 25 or 30 feet higher than ground to the north of it upon which railroad tracks are located. Several hundred feet north of the street is the Mississippi river, flowing east and approximately parallel with High street. Between the street and the river upon low ground are located the tracks of the two defendants, running approximately parallel with the river and High street. The tracks of the defendant receiver are nearest High street. Numerous tracks of the defendant Great Northern are nearest the river. The street is separated from the tracks by a stone retaining wall. * * * The wall is not in the street, but constitutes the north edge of the street. There is no space between the street itself and the wall. The street is platted 50 feet wide. It is often used as a park, but is not officially so. The city put benches upon it. There is no use of the street by vehicles. Nothing has been laid out in the line of sidewalks, but it is used extensively by pedestrians, especially in the summer time. * * *

"The retaining wall was constructed and is owned by the Great Northern Railway Company. It stands outside the property of the Minneapolis & St. Louis Railroad Company, between the right of way of that company and the street. The wall is 28 feet 5 inches high, the south edge of it being coincident with the north line of High street. The north edge of the wall at the base is coincident with the south boundary of the 26-foot strip used by the defendant receiver, which was conveyed to the Minneapolis & St. Louis Railroad Company on September 11, 1896. * * * The north face of the wall is not perpendicular, but slopes to the south between the base and the top a distance of 1 foot 10 inches; that is, the top of the wall is 22 inches south of the base of it. * * *

"There is a difference in construction about 3½ feet from the top of the wall, consisting of a parapet 3½ feet below the top of the wall, which is a projection of the stone in toward the embankment side. This projection is from 1 foot to 1½ feet, varying according to the roughness of the stone. The wall comes up about 3 feet from the parapet and then there is a little capstone at the top which projects 6 inches in and 6 inches on the outside at the top of the wall. * * *

"When the wall was first built and the

ground was in its natural condition and before there was any change or dumping, the height of the wall above the natural level of ground between Marquette and the end of the wall on the east varied. The wall was higher above the ground on the Second avenue end. The least difference between the level of the ground and the height of the wall was on the Marquette end, and was about 2½ or 3 feet and varied from that up to 6 feet or so as the ground tapered down.

\* \* \*

"When the wall was built the height of the wall above the ground at a point 16 feet west of the flagpole was about 5 feet, and continued in that condition until 1918, when the war broke out. \* \* \*

"When the war broke out, they graded the land to the south of the wall and used it for drilling. That was done in 1918. After the soldiers were trained they made sort of a park out of it; planted trees and put in benches. Prior to the time the land was graded and the dirt was leveled off it was not used as a park at all—it was not frequented by people.

" \* \* \* When the ground was being leveled off for the soldiers they put gravel on High street and leveled it off and filled it up to the wall—graded it to the wall. Ever since 1917 or 1918 the ground at certain points between Marquette and Second Avenues South has been practically level with the top of the wall. \* \* \* The ground slopes down to the east. \* \* \* At a point 20 feet west of the flagpole the top of the wall was about 2 or 3 feet above the surface of the ground.

"The vacant block to the south bounded by Marquette, Second avenue, High street and First street is owned by the Northern Pacific. This ground is a little bit higher than First street, probably 2 or 3 feet.

"On the morning of January 24, 1926, the coroner was called and found the dead body of Hans Hendrickson below the retaining wall and on the right of way of the defendant receiver. The body had been dragged, and following back in the snow he came to an impression in the snow at the base of the wall. He went up to the top of the wall and found the footprints of a man in the snow leading up to the wall at a point directly above the impression which had been made in the snow below. The footprints came from First street and across the park to the wall approximately at right angles, and intersected the wall at about a rod west of the flagpole. It was a very cold morning,

way below freezing, and the body was frozen solid. There was a bottle on the person of the deceased in the overcoat pocket which was broken and had the odor of whisky. He could not tell whether the deceased had been intoxicated. The coroner found this body at 9 or 10 o'clock in the forenoon. Death had occurred 7 or 8 hours earlier, probably from the fall.

"The testimony was conflicting as to whether the wall at the point where the footprints led up to it was level with the ground or was above the level of the ground.

"There were 4.2 inches of snow on the ground, which had fallen on January 19th, except for a trace on the 23d. There was no imprint in the snow on the top of the wall—not sufficient snow to hold an imprint. There was no railing or fence on top of the wall."

The vital facts in the above statement are that the northern base of this wall coincided with the southern line of appellant's right of way; that the northern face of the wall sloped to the south so that the northern line of the wall at the top was 1 foot and 10 inches back from the southern line of the right of way; that the wall is 28 feet 5 inches high; and that neither it, nor the ground upon which it stands, nor that to the south of it, is the property of appellant. These facts make clear that the erection of a wall or fence upon the property of appellant would not have prevented this accident and its result and therefore the omission to make such erection there could not have been the proximate cause of the accident. The only place where a barrier could have prevented this accident would have been on top of or south of this wall, either of which locations would have been off of the property of appellant and upon property in which he had no sort of legal interest or right. Under these circumstances, there was clearly no common-law duty to erect a useless barrier on the property of appellant and there was no common-law right to go upon the property of another to raise such barrier. Whether a state statute could create such an obligation, and give such a right, we need not inquire, as the statutes of Minnesota, relied upon here, do not pretend to do so. The only applicable statutes suggested by counsel are sections 4744 to 4747, inclusive, of Mason's Code of the Laws of Minnesota, reading as follows:

"*4744. Fences and cattle guards*—Every such company shall build and maintain on each side of all lines of road owned and oper-

ated by it, good and substantial fences: * * * Provided, that in the building and maintenance of said fences and cattle guards, every such company shall be held to the exercise of ordinary diligence and care. * * *

"4745. *Liability for failure to fence, etc.* —Any such company failing to comply with the requirements of section 4744 shall be liable for all damages resulting therefrom, and for all domestic animals killed or injured by its negligence. * * *

"4746. *Fences—crossings—cattle guards* —Any such company operating a line of railroad in this state, which has failed or neglected to fence said road and to erect crossings and cattle guards, shall be liable for all damages sustained by any person in consequence of such failure or neglect. * * *

"4747. *Fences between railroad and public road*—If any such company shall fail to fence its line where the same adjoins a public road or street, or lies so near thereto as to render travel thereon dangerous, the governing body of the town or municipality having charge of such road or street, by notice as in case of abutting landowner, may require such fence to be built; and, in case of failure to build such fence for the time provided in section 4746, such town or municipality shall have the rights and remedies given by said section to such abutting owner."

Obviously, section 4747 cannot apply, as no notice, as required by that section, is claimed to have been given by the municipality. Sections 4745 and 4746 merely create a liability for failure to obey section 4744. Section 4744 requires every railroad company to "build and maintain *on each side of* all lines of road owned and operated by it, good and substantial fences." The Supreme Court of the state, in Gould v. Great Northern Railway Co., 63 Minn. 37, 65 N. W. 125, 30 L. R. A. 590, 56 Am. St. Rep. 453, has construed the meaning of the words "on each side of" as used in 4744 to mean "that the fence must be built on the margin or border of the entire railroad right of way," or that if it is built within the borders of the right of way, the adjoining landowner shall have the right to join his fences thereto. This decision necessitates the construction that the section creates no obligation on the part of the railroad company to go outside of its right of way upon the land of some other owner, in which it has no right or interest, to erect the fence required by this statute. If there were no such decision, we think the above result should follow because it would be such an unusual and extraordinary thing

to require a trespass upon the lands of another that such could not be construed to be required except upon the very clearest expression. Obviously, there is no such expression here.

Because there was no statutory nor common-law duty to go upon the land of another to erect a barrier and because the erection of any possible barrier upon the right of way or the boundary of the right of way of this appellant could not have had the slightest effect in preventing this accident, and therefore the omission to do so was not a proximate cause thereof, we think the trial court erred in not directing a verdict for the appellant and that the case should be reversed and remanded for a new trial.